In re ARTHUR TREACHER'S FRANCHISEE LITIGATION.

MAGNESCO RESTAURANTS, INC., Appellee,

v.

ARTHUR TREACHER'S FISH & CHIPS, INC. and Mrs. Paul's Kitchens, Inc., Appellants.

No. 81-2202. MDL No. 467.

United States Court of Appeals, Third Circuit.

Argued March 18, 1982.

Decided June 18, 1982.

John M. Elliott, Edward F. Mannino (argued), John F. Stoviak, Thomas J. Elliott, Karen Marek McAlinn, Henry F. Siedzikowski, Edward S. Wardell, Timothy W. Callahan, II, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellants.

Franklin Poul, Judith R. Cohn (argued), Barry M. Klayman, Mark R. Rosen, Wolf, Block, Shorr & Solis-Cohen, Philadelphia, Pa., Weil, Gotshal & Manges, New York City, for appellee.

Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

On this appeal, we are asked to determine whether the district court properly adjudged Arthur Treacher's Fish & Chips, Inc. (Arthur Treacher's) and its corporate parent, Mrs. Paul's Kitchens, Inc. (Mrs. Paul's),[1] in contempt of a March 26, 1981 temporary restraining order, which enjoined Arthur Treacher's and Mrs. Paul's from *inter alia* "interfering with [appellee] Magnesco's sources of supply for the products necessary to the operation of its franchise" and "taking any other action which hinders or impedes the operation of Magnesco's business (A. 55a–57a). The temporary restraining order was thereafter extended by the consent of the parties.

We conclude that we have jurisdiction of this appeal, that Arthur Treacher's was afforded a proper hearing on the issue of contempt, and that the district court's findings which resulted in the court adjudging Arthur Treacher's and Mrs. Paul's in contempt, were not clearly erroneous. Thus, we affirm.

### I.

Arthur Treacher's is the franchisor of Arthur Treacher's restaurants, and in addition owns and operates such restaurants. Magnesco Restaurants, Inc. (Magnesco) is a franchisee of Arthur Treacher's, owning and operating three Arthur Treacher's restaurants in the Bronx, New York (A. 12a). The facts underlying this case involve the same franchising dispute that is the subject of this court's decision in *Arthur Treacher's Fish & Chips, Inc. v. A & B Management Corp.*, 689 F.2d 1137, No. 81–2306; 81–2562, which we have filed today. Arthur Treacher's franchise history and background (including its acquisition by Mrs. Paul's) is set out in detail in our opinion in *A & B Management* to which we have just referred. We therefore do not repeat those facts here, but limit this factual recitation to only those matters which involve the instant controversy between Arthur Treacher's and Magnesco.

On March 7, 1981, Magnesco received a letter from Arthur Treacher's terminating Magnesco's franchise. Arthur Treacher's gave as a reason for the termination that Magnesco had failed to make payments on amounts owed to Arthur Treacher's for

---

1. Our references to Arthur Treacher's throughout this opinion are deemed to include Mrs. Paul's.

loans, rent, and franchise fees (A. 47). Magnesco, while disputing the amounts of monies claimed, concedes that it, like many other Arthur Treacher's franchisees, had ceased paying royalties because of Arthur Treacher's failure to abide by its commitments to its franchisees (A. 22).

Subsequently, on March 12, 1981 Arthur Treacher's instructed its exclusive distributor for the Bronx, Worcester Quality Foods, to cease shipping supplies to Magnesco. Worcester supplied 90 percent of the food and other items necessary to the operation of Magnesco's franchise (A. 359a). Since Magnesco had no source other than Worcester for these supplies, its business was threatened with imminent destruction (A. 29, 52).

On March 19, 1981 Magnesco filed a complaint in the United States District Court for the Southern District of New York charging Arthur Treacher's and Mrs. Paul's with violations of the antitrust laws, breach of contract, breach of fiduciary duty to the franchisees and other claims. Magnesco alleged that Arthur Treacher's termination letter and instructions to Worcester were part of a scheme to coerce its franchisees into purchasing certain products either from Arthur Treacher's or Mrs. Paul's, or, from one or two other designated suppliers (A. 30–32). According to Magnesco, this scheme constituted a restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Consequently, Magnesco's complaint sought an injunction prohibiting Arthur Treacher's and Mrs. Paul's from terminating Magnesco's franchise, from interfering with Magnesco's sources of supply and from attempting to collect monthly franchise fees from Magnesco (A. 37). Magnesco then sought a temporary restraining order which would prevent Arthur Treacher's from, among other things, interfering with Magnesco's sources of supply.

On March 26, 1981, District Court Judge Leonard Sand of the Southern District of New York entered a temporary restraining order restraining Arthur Treacher's from, "taking any . . . action which hinders or impedes the operation of Magnesco's business," including "interfering with Magnesco's sources of supply . . . ." (A. 56). The relevant text of this order is set out in detail later in this opinion. Thereafter, Arthur Treacher's, by stipulation and without a hearing, consented to an extension (without specific date) of the March 26, 1981 order, which otherwise would have expired by its terms on April 3, 1981.

During the pendency of Judge Sand's order, Worcester Quality Foods had continued supplying Magnesco. On June 4, 1981, however, Arthur Treacher's terminated its distribution agreement with Worcester Quality Foods (A. 64a–68a, 79a, 81a–82a), so that Worcester, from that date forward, was no longer an approved supplier of Magnesco and could not supply Magnesco as an Arthur Treacher's franchisee.

On June 16, 1981 Magnesco filed a contempt motion in the Eastern District of Pennsylvania, where this case had been transferred by the Judicial Panel on Multidistrict Litigation. It sought to hold Arthur Treacher's and Mrs. Paul's in contempt of the order of March 26, 1981 as extended, claiming that Arthur Treacher's actions with respect to Worcester Quality Foods violated that order. Evidentiary hearings were held on Magnesco's contempt motion and on July 21, 1981, Judge Hannum of the Eastern District of Pennsylvania, after making findings of fact, held both Arthur Treacher's and Mrs. Paul's in contempt of Judge Sand's order.

This appeal followed.[2]

## II.

We initially turn to the question of our jurisdiction. Two jurisdictional problems

---

**2.** The instant action, No. 81–2202, was initiated by Magnesco and resulted in this appeal by Arthur Treacher's from its contempt citation. Another action was initiated by *M.I.E. Hospitality, Inc.*, No. 81–2201. Arthur Treacher's was held in contempt in the M.I.E. action as well as the Magnesco action. Subsequently, however, M.I.E. and Arthur Treacher's reached a settlement resolving all disputes between them, including the instant appeal at 81–2201. The parties' joint motion to dismiss the appeal is granted.

are presented. First, Magnesco asserts that we do not have jurisdiction of Arthur Treacher's appeal because no appeal may be taken from a temporary restraining order. Second, Magnesco claims that an appeal from an adjudication of civil contempt does not vest us with jurisdiction.

### A.

Although by its terms a temporary restraining order resembles an injunction, and thus a grant or denial of such an order would superficially appear to provide a basis for an appealable order reviewable by this Court, see 28 U.S.C. 1292(a)(1), it has generally been held that an appeal may not be taken from an order granting or denying a temporary restraining order. *See, e.g., United States v. Crusco,* 464 F.2d 1060, 1062 (3d Cir. 1972); *Richardson v. Kennedy,* 418 F.2d 235 (3d Cir. 1969) (per curiam). The fundamental reason for the difference in appealability between a temporary restraining order and all other injunctive orders is that a temporary restraining order is severely limited in duration. *See, e.g.,* F.R. Civ. P. 65(b), (10 days); 29 U.S.C. § 160(*1*), (5 days). Thus, the fact that a temporary restraining order is limited to short periods of time by the very authority which authorizes its issuance, and the fact that it expires by its own terms, or by court order when a preliminary injunction is entered, makes an immediate appeal unnecessary and generally futile.

By its very nature, before an appeal which challenged the provisions of a tempo-rary restraining order could be perfected and heard, all restraints imposed in such an order would have expired. It is largely for that reason[3] that the doctrine has evolved that temporary restraining orders are not appealable. Thus, Magnesco urges upon us here that no appellate jurisdiction has attached because the injunctive order issued by Judge Sand was granted and remained in effect as a "temporary restraining order." We cannot agree.

Here, the temporary restraining order was entered on March 26, 1981. On March 31, 1981, it was extended by consent, without date.[4] Rather than a restraining order of short duration, the order restraining Arthur Treacher's extended for some eighty days and was continuing in effect when Magnesco's contempt motion was brought.

We recognize that Fed. R. Civ. P. 65(b) permits an extension of the operative terms of a temporary restraining order. The rule provides:

> Every temporary restraining order . . . shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.

█ We also recognize, as we have noted earlier, that Arthur Treacher's by stipulation consented to an extension of Judge Sand's March 26th order.[5] However, when

---

**3.** Judge Tuttle, writing for the Fifth Circuit in *Connell v. Dulien Steel Products,* 240 F.2d 414, 418 (5th Cir. 1957), put it this way:

> The practical reasons for not generally allowing appeals from temporary restraining orders are that (1) they are usually effective for only very brief periods of time, far less than the time required for an appeal (which accounts for the paucity of cases on this point), and are then generally supplanted by appealable temporary or permanent injunctions, (2) they are generally issued without notice to the adverse party and thus the trial judge has had opportunity to hear only one side of the case, and (3) the trial court should have ample opportunity to have a full presentation of the facts and law before entering an order that is appealable to the appellate courts.

**4.** The consent to extension was granted until such time as the district court (Judge Hannum of the Eastern District of Pennsylvania) ruled on cross motions for preliminary injunctions filed in the related *A & B Management* case.

**5.** It is stipulated by and between the plaintiff Magnesco Restaurants, Inc., on the one hand, and Arthur Treacher's Fish & Chips, Inc., and Mrs. Paul's Kitchens, Inc., that the various motions and applications pending before me, including the plaintiff's application for a preliminary injunction and the defendants' motion for a transfer, the defendant's requests that security issued by the defendants be

a temporary restraining order is extended far beyond its statutory limits, even though it is authorized by the consent of the party against whom it is directed,[6] such an order begins to lose its character as a temporary restraining order and begins taking on characteristics of a preliminary injunction order which, under 28 U.S.C. 1292(a)(1), is appealable. Such an instance occurred in *New York Telephone v. Communications Wkrs.*, 445 F.2d 39 (2d Cir. 1971).

In *New York Telephone,* the Second Circuit ruled that a temporary restraining order extended indefinitely by consent was nevertheless appealable under section 1292(a)(1). In that case, a dispute had arisen over involuntary employee transfers made by New York Telephone. As a result, the Communication Workers local had begun a boycott of all overtime work. The company then sought, and was granted, a temporary restraining order enjoining the local " 'from engaging in, or organizing, inducing or encouraging others to engage in any strike . . . or any other form of interference with the business of plaintiff.' " 445 F.2d at 43. Subsequently, that order was extended indefinitely by consent, while the parties engaged in settlement discussions.

The dispute over the involuntary employee transfers was amicably settled, but approximately six months later another controversy arose over available overtime work and the local again threatened to strike. The company moved to hold the local in contempt of the earlier restraining order and its motion was granted, even though the local argued that the scope of the order did not encompass the later controversy.

On appeal, the Second Circuit first addressed its own jurisdiction and concluded that the contempt was reviewable since it was issued in connection with an order [the "temporary restraining order"] appealable under Section 1292(a)(1).

> That section permits an appeal from an interlocutory order "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." In effect, the July 1, 1970 consent to the temporary restraining order's indefinite extension changed that order into a preliminary injunction. Although Rule 65(b), Fed. R. Civ. P., provides that a temporary restraining order may be extended indefinitely by consent, that definition is not conclusive for purposes of § 1292(a)(1). At least where the restraining order has been in effect for many months and where there is no possibility of interfering with the district court's orderly disposition of a motion for a preliminary injunction, the rationale against reviewing a grant or denial of a temporary restraining order is absent.

445 F.2d at 46 (citations omitted).

Considerations similar to the ones that underlay the Second Circuit's decision in *New York Telephone* are present here. Here, as in *New York Telephone,* the original restraining order had been extended indefinitely by the parties' agreement. Moreover, any action taken by this Court cannot interfere with any of the district court's proceedings. From March 26, 1981, the date on which Judge Sand issued the "temporary restraining order" until this

---

increased, and any and all other matters presently before me, are deferred pending the determination by Judge Hannum in the matter which he is now hearing, brought on cross-motions for preliminary injunctions by the defendants herein and a franchisee by the name of A & B Management Corp.; that when Judge Hannum issues a determination with respect to those motions this Court is to be advised, . . . that in the interim the status quo as it exists following the issuance and effectiveness of the temporary restraining order previously issued by this Court shall continue and be maintained. (A. 439–440).

**6.** We point out that we are here not concerned with cases where consent is *not given* by the enjoined party, *see, e.g., Sampson v. Murray,* 415 U.S. 61, 86–88, 94 S.Ct. 937, 951–952, 39 L.Ed.2d 166 (1974) (temporary restraining order extended beyond Fed. R. Civ. P. 65(b) time limits is appealable); *Pan American World Airways v. Flight Engineers International Ass'n,* 306 F.2d 840, 843 (2d Cir. 1962) (same), or with a situation where the temporary restraining order is extended beyond the terms of the enjoined party's consent, *see Sims v. Greene,* 160 F.2d 512 (3d Cir. 1947).

matter came before us, no preliminary injunction hearings were held, either with respect to the substance of the March 26th order, or otherwise. Additionally, the controversy as presented to us is not a challenge to the validity of the March 26th order or its provisions, but is rather directed to the question of whether the provisions of that order were violated by Arthur Treacher's, thereby resulting in an appropriate contempt adjudication.

■ These factors differentiate the "temporary restraining order" in this case, from the generally non-appealable temporary restraining order.[7] We therefore hold that under the circumstances presented here, the March 26, 1981 order, issued by Judge Sand as a temporary restraining order, is in effect, and tantamount to, a preliminary injunction for the purposes of Section 1292(a)(1).[8]

### B.

Having concluded that the order which gave rise to the contempt citation of July 21, 1981, was a preliminary injunction and thus appealable, we can treat with the remaining aspect of appealability, i.e., the appealability of the civil contempt order itself, in short order.

7. Nor are we persuaded that the manner in which Judge Sand styled his order should be controlling for the purposes of our appellate jurisdiction. We agree with the instruction found in *Smith v. Grady,* 411 F.2d 181, 186 (5th Cir. 1969):

 In deciding the jurisdictional question, this Court will look beyond terminology to the actual content, purport, and effect of that which may otherwise be described as a temporary restraining order or as a preliminary injunction.

8. Arthur Treacher's claims that because no findings of fact were made by Judge Sand when he issued his order, the restraining order must be vacated, citing *Sims v. Greene,* 160 F.2d 512 (3d Cir. 1947). As we have observed earlier, however, in *Sims* no consent to the final extension of the temporary restraining order was ever given. This circumstance alone distinguishes that case from this case where Arthur Treacher's consented to an indefinite extension of the March 26, 1981 order. Moreover, Arthur Treacher's argument is of dubious validity in light of *Sampson v. Murray,* 415 U.S.

Although an adjudication of civil contempt by a party is not generally deemed appealable, *see, e.g., United States Steel Corp. v. Fraternal Ass'n of Steel Haulers,* 601 F.2d 1269, 1273 (3d Cir. 1979), we have held otherwise when it has issued in connection with another order that is appealable, such as an underlying preliminary injunction. *See United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1179 (3d Cir. 1976); *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1340 (3d Cir. 1976); *Kershner v. Mazurkiewicz,* 670 F.2d 440, 449 n. 12 (3d Cir. 1982) (en banc); and *see* discussion in *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 640 (3d Cir. 1982) (en banc), (Garth, J. concurring and dissenting).

■ Having thus held that Judge Sand's March 26, 1981 order, as extended, is appealable, we have no difficulty in holding that the order of July 21, 1981 which adjudged Arthur Treacher's in civil contempt, is likewise appealable.[9]

### III.

On the merits, Arthur Treacher's argues that (1) it did not violate the March 26th restraining order; and (2) that the remedy ordered by the district court exceeded the restraints which Judge Sand had imposed.

61 at 86–87, 94 S.Ct. 937 at 951, 39 L.Ed.2d 166 n. 58. *See also* C. Wright & A. Miller, Federal Practice and Procedure Civil § 2953, pp. 521–522 (1973).

9. Magnesco, in urging that we dismiss Arthur Treacher's appeal, claims that the Notice of Appeal from the injunctive order underlying the contempt order was filed out of time. *See* F.R.A.P. 4(a). In response, Arthur Treacher's argues that the March 26, 1981 order was modified by Judge Hannum of the Eastern District of Pennsylvania on July 21, 1981 and on that date additional requirements were imposed which thereby changed the terms of the initial restraints. Arthur Treacher's appeal was filed within 8 days of the July 21, 1981 order and thus on this basis was timely.

 While as a matter of substance we are not convinced by this "modification" argument, *see* note 14 *infra,* we are satisfied, however, that from the standpoint of our jurisdiction, Arthur Treacher's contention in this respect, is persuasive.

In addition, Mrs. Paul's contends it was improperly adjudged in contempt as there was no evidence that Mrs. Paul's had participated in any violation of the March 26th order.

## A.

Arthur Treacher's arguments in support of its position that it did not violate any restraint, is to say the least, not set forth with clarity. As best as we can discern, Arthur Treacher's claims that it did not disobey any provision of the March 26th order because no specific term of that order prevented Arthur Treacher's from terminating an approved distributor, such as Worcester Quality Foods. Moreover, as we understand the argument, Arthur Treacher's also claims that no specific provision of that order precluded it from substituting one approved dealer for another. Thus, Arthur Treacher's argues that it terminated Worcester as an authorized distributor, but only after ensuring that a replacement, Southland Corp. was in place and ready to assume distribution to all affected franchisees (A. 204a). Accordingly, Arthur Treacher's contends that no violation of the restraining order occurred when it terminated Worcester Quality Foods as an approved distributor of Arthur Treacher's products and substituted Southland Corp. in its stead. We believe that this argument misses the point.

■ It is true that injunctions and restraining orders must give fair notice of the conduct that is prohibited, see, e.g., F.R. Civ. P. 65(d); *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 444, 94 S.Ct. 1113, 1126, 39 L.Ed.2d 435 (1974); *Ford v. Kammerer,* 450 F.2d 279, 280 (3d Cir. 1971). It

is also true that the March 26th restraining order did not name Worcester Quality Foods and contained no explicit provisions which would have required Arthur Treacher's to continue Worcester as an approved supplier for Magnesco. Nor did the order specifically state that Arthur Treacher's was prevented from substituting another supplier for Worcester.

■ What the March 26, 1981 order did give fair notice of, and *did prohibit,* was any action by Arthur Treacher's that would interfere "with Magnesco's sources of supply for the products necessary to the operation of its franchise..."[10] Thus the thrust of the restraining order, while not drawn in terms of specific suppliers, or in terms of continuing particular distributors, did direct the cessation of any interference with Magnesco's operations. Indeed it was this concern over Arthur Treacher's interference that prompted Magnesco in the first instance to seek a restraining order. It is evident that Magnesco had filed its complaint and sought a restraining order only after Arthur Treacher's had threatened to destroy Magnesco's business by directing Worcester, Magnesco's primary supplier, to refuse Magnesco's orders for supplies.[11] Thus, the order which resulted from Magnesco's motion gave clear notice to Arthur Treacher's that it was proscribed from interfering with Magnesco's sources of supply and enjoined Arthur Treacher's from taking *any action* "to hinder or impede the operation of Magnesco's business."

It is evident that Judge Hannum read Judge Sand's order as we do, for the district court's findings are properly focussed upon whether Arthur Treacher's interfered in any way with Magnesco's operations. Measured by a clear and convincing stan-

---

**10.** In relevant part, the March 26, 1981 order provided, that in order to maintain the *status quo* of the parties, the

defendants [Arthur Treacher's and Mrs. Paul's] are temporarily restrained and enjoined from terminating Magnesco's franchise, interfering with Magnesco's sources of supply for the products necessary to the operation of its franchise, accelerating the amounts due on a promissory note payable to ATFC by Magnesco, taking any action what-

soever to terminate Magnesco, attempting to collect franchise fees from Magnesco, and taking any other action which hinders or impedes the operation of Magnesco's business; ....

**11.** Not only had Arthur Treacher's instructed Worcester to stop supplying Magnesco, it had also instructed the companies which supplied Worcester with Arthur Treacher's products, not to sell to Worcester (A. 702a).

dard of proof, see *Schauffler v. Local 1291, Int'l. Longshoreman's Ass'n*, 292 F.2d 182, 189 (3d Cir. 1961), Judge Hannum found that it had.

Judge Hannum in reviewing the evidence held that Magnesco had established by clear and convincing proof that a violation of both the letter and spirit of Judge Sand's order had occurred. Judge Hannum found that 90% of Magnesco's supplies had been furnished by Worcester. Worcester's service to Magnesco had been excellent. Worcester had been terminated as a supplier to Magnesco on June 4, 1981. Magnesco had not been notified by Arthur Treacher's at any time prior to June 17, 1981 that Worcester had been terminated. Nor had Magnesco been advised prior to June 17, 1981 that a substituted supplier would be made available. The first communication from the purported substitute supplier (Southland Corp.) was received by Magnesco on June 24, 1981, some twenty days after Worcester had been terminated and one week after Magnesco had filed its motion to hold Arthur Treacher's in contempt.

Judge Hannum also found that Worcester had been charging customers such as Magnesco, its (Worcester's) cost plus 7½% for supplying them with Arthur Treacher's products. In comparison, he found that Southland's charge was cost plus 12%—an increase of 4½%. Thus he found that even if there had been no lapse in time between Southland replacing Worcester as Magnesco's supplier, there was no proof that Southland's terms would be comparable to the terms of the agreement which Magnesco had with Worcester. On this issue of pricing, Judge Hannum found "[a]lthough the evidence is not conclusive as to whether the cost figure would vary, it is undisputed that the Southland markup is significantly higher, leading at least to a reasonable inference that its price [to Magnesco] would also be higher." (A. 362a–363a).

12. Statements by counsel for Arthur Treacher's tend to indicate that Worcester was terminated because it continued to supply franchisees that were involved in litigation with Arthur Treacher's, including Magnesco. In arguing against Magnesco's motion for contempt, counsel for Arthur Treacher's stated:

Judge Hannum also found that a distribution agreement and the change to a new distributor could not be effected overnight because credit terms had to be arranged, delivery routes and schedules had to be worked out, and prices had to be negotiated. Thus he did not credit Southland's testimony that it could have begun distributing to Magnesco within 24 hours. He discounted this claim by recognizing that even though physical delivery of products might have been made to Magnesco within that timeframe, a binding agreement between Southland and Magnesco could not have been reached within 24 hours so as to accomplish an interruption-free transition from Worcester to Southland. Indeed, the very argument that Arthur Treacher's urges in support of its position was put to rest by Judge Hannum, who explained:

Had Magnesco been notified prior to the termination of Worcester that its relationship with Arthur Treacher's was to be ended, had Magnesco been advised prior to the termination of Worcester of the availability of Southland, and, had Magnesco and Southland succeeded in negotiating an agreement comparable to the one in existence between Worcester and Magnesco, a different situation would exist; however, the factual scenario painted points clearly and convincingly to a different series of events than those just hypothesized by the Court.

A. 361a.

The evidence that resulted in these findings led Judge Hannum to make the additional finding that Arthur Treacher's interference with Magnesco's source of supply, and thus its operations, occurred on June 4, 1981 when Arthur Treacher's terminated Worcester as Magnesco's supplier.[12] Judge Hannum concluded his findings in this respect by stating:

That is the same Worcester that had been told by us not to supply different people, including Magnesco.

Worcester, Your Honor, is—Mr. Magnesco or Mr. Magnes of Magnesco admitted that he is still being supplied by Worcester.

(Tr. July 16, 1981 at 69–70.)

...[t]he Court finds that Magnesco has satisfied its burden of establishing a violation of the temporary restraining order by clear and convincing evidence that its source of supply has been interfered with and, accordingly Magnesco's motion for contempt will be granted.

## A. 363a.

We have independently and carefully reviewed the evidence. In doing so, we observe that no representative of Arthur Treacher's or Mrs. Paul's testified at the hearing. The only evidence produced in support of Arthur Treacher's position came from one franchisee and from Southland whose principal testified, but whose testimony was not credited by the district court.

We review fact findings of the district court by a "clearly erroneous" standard. *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972). We are satisfied that the findings made by Judge Hannum are not clearly erroneous.[13]

## B.

Arthur Treacher's next argument on this appeal challenges the scope of the remedy which Judge Hannum ordered. According to Arthur Treacher's, the district court exceeded its powers when it required Arthur Treacher's to reinstate Worcester as an approved supplier for Magnesco when neither the March 26, 1981 restraining order, nor the underlying franchise agreement, required the continuation of Worcester as a distributor.[14] The contempt order assessed Arthur Treacher's $1,000 a day from July 21, 1981 until Worcester was reinstated.

It has long been established that district courts have broad powers to fashion remedial relief in civil contempt proceedings. In *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949), the Supreme Court reviewed a civil contempt proceeding arising out of a decree enjoining the paper company from violating the Fair Labor Standards Act. In a contempt proceeding, the district court held that the company had violated the Act by fictitiously computing wages. The court, however, refused to issue a contempt citation, for, among other reasons, it held that it did not have the power to enforce compliance with its earlier injunction by compelling the payment of the statutorily mandat-

---

**13.** Arthur Treacher's also argues that it did not violate the March 26, 1981 restraining order because even though it terminated Worcester as a distributor, Worcester continued to supply some products to Magnesco. We reject any suggestion that Arthur Treacher's should benefit from actions taken by Worcester in derogation of Arthur Treacher's termination instruction. The March 26, 1981 order prohibited Arthur Treacher's from interfering with Magnesco's source of supply. Any action taken by Arthur Treacher's to stop Worcester from supplying Magnesco constituted such interference, (as found by Judge Hannum), whether or not it fully succeeded.

**14.** Arthur Treacher's argues that we must measure the contempt order by the standards normally applied to preliminary injunctions. The argument is made that because the district court is required to make findings of fact in connection with preliminary injunction proceedings, the same requirements obtain here because the July 21st contempt order, according to Arthur Treacher's, itself constituted "improper mandatory injunctions of indefinite duration requiring Arthur Treacher's to reappoint specific terminated distributors to service

plaintiffs." Brief of Appellants at 25. Arthur Treacher's cites no authority for equating a civil contempt order with an injunctive order.

Even so, we observe that despite Arthur Treacher's assertions to the contrary, the district court *did* hold two days of evidentiary hearings and *did* make findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52 and 65.

We do not read the district court's order of July 21, 1981 which imposed remedies as a result of Arthur Treacher's infractions as an "improper mandatory injunction" or indeed as expanding upon the injunctive provisions of Judge Sand's March 26, 1981 order. The findings of violation made by Judge Hannum fully support the relief which he fashioned in the July 21st order. That relief did no more than reestablish the *status quo* which Judge Sand's order sought to maintain, and to which reference is specifically made in the March 26th order. While we have accepted Arthur Treacher's argument as sufficiently colorable for jurisdictional purposes, see note 9, *supra,* we reject it as a matter of substance.

ed wages. The Court of Appeals affirmed, but the Supreme Court reversed.

The Supreme Court found that the district court had the power to order the company to pay damages for its violation of the injunction, even though the injunction did not specify the names of the payees or the amount that was due them. The court emphasized the broad nature of a district court's power to remedy civil contempts:

> We are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. They may entail the doing of a variety of acts, such as the production of books. They may also require the payment of money as in the alimony cases.

336 U.S. at 193–94, 69 S.Ct. at 500–501 (citations omitted).

■ In exercising remedial powers in civil contempt proceedings, courts may require the contemnor to perform various affirmative acts, even though these actions were not mandated by the underlying decree. In *N.L.R.B. v. J.P. Stevens & Co., Inc.,* 563 F.2d 8 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978), the Second Circuit reviewed contempt proceedings instituted to remedy the company's compliance with a prior injunction prohibiting the company from " 'interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization....' " 563 F.2d at 15. The Second Circuit approved a contempt order that re-

quired the company to formulate rules for employee conduct in manufacturing plants and to establish a continuing educational program for supervisory personnel in the area of the rights of union organizers. Similarly, the court in *Franklin Mint Corp. v. Franklin Mint, Ltd.,* 360 F.Supp. 478 (E.D. Pa. 1973), required a party which had disobeyed an injunction prohibiting an infringement of a trademark to publish certain statements, including an affirmative disclaimer of any relationship to the plaintiff.

■ In light of remedies that have been prescribed in the contexts of cases involving environmental violations, sex discrimination, segregated schooling, unconstitutional hospital confinement, unconstitutional hospital, health and prison conditions, and the like, we are fully satisfied that the minimally intrusive *status quo* relief formulated by Judge Hannum in his July 21st order, is well within the bounds of his authority, and is thoroughly appropriate. Here as we have discussed, Judge Hannum found that Arthur Treacher's without good cause, had terminated Magnesco's primary supplier in direct contravention of Judge Sand's order. That order had been issued to maintain the *status quo* of the parties. Arthur Treacher's cannot now complain if that *status quo* is restored.[15]

### C.

■ Finally, Arthur Treacher's contends that Mrs. Paul's was improperly held in

---

**15.** Arthur Treacher's has cited numerous cases in support of its argument that in fashioning its contempt order the district court could not go beyond the parties' underlying agreements. Those cases are in the main irrelevant, however, as virtually all of them involve determinations concerning the grant of preliminary injunctions. (*Cf.* note 14, *supra.*) In *Stenberg v. Cheker Oil Co.,* 573 F.2d 921 (6th Cir. 1978) the Court of Appeals for the Sixth Circuit did vacate a contempt order, in part because the district court's remedial order, while granting the plaintiff specific performance, relieved it of various obligations imposed by the parties' licensing agreement. *Stenberg* is distinguisha-

ble, however, since the contempt order at issue here does not relieve Magnesco of any of its obligations as an Arthur Treacher's franchisee, and does no more than require a return to the *status quo.*

Another meritless contention made by Arthur Treacher's is that the district court's contempt order mandates the infringement of Arthur Treacher's trademarks. The March 26, 1981 restraining order, however, requires that Arthur Treacher's maintain Magnesco as an authorized franchisee. It follows, that Magnesco, as an authorized franchisee, cannot possibly infringe Arthur Treacher's trademarks.

contempt because there was no separate evidence as to Mrs. Paul's conduct. We find this argument as unconvincing as Arthur Treacher's other claims on the merits. It is far too late in the game for Arthur Treacher's to assert that we are dealing with separate and independent entities here. We observed earlier that the history of Arthur Treacher's and Mrs. Paul's franchise relations was not recounted in this opinion because it had been chronicled in considerable detail in our related *A & B Management* opinion. We noted there that on November 21, 1979, Arthur Treacher's was acquired by Mrs. Paul's. The record in *A & B* provides abundant evidence that since that time, Mrs. Paul's has carried out virtually all of the management and administration of Arthur Treacher's operations, and that it is Mrs. Paul's that "calls the tune." It is not surprising therefore, that the specific act which prompted the violation and contempt at issue here, the termination of Worcester, was carried out by Arthur Treacher's and Mrs. Paul's jointly. Indeed, the very termination letter was signed by Anthony Hom, (A. 81–82), a lawyer on the payroll of Mrs. Paul's. *Arthur Treacher's Restaurant Inc. v. A & B Management Corp.*, 689 F.2d 1137 (3d Cir. 1982).

In this case, the March 26, 1981 restraining order was directed against both Arthur Treacher's and Mrs. Paul's and both consented to its extension on March 31, 1981.

Mrs. Paul's, having consented to the extension of the March 26, 1981 order and then having joined in actions which violated that order, is in no position to argue now that it has been unfairly adjudicated in contempt.

## IV.

 Having satisfied ourselves that we properly have jurisdiction of this appeal, we have reviewed the merits of Arthur Treacher's claims contesting the July 21, 1981 order which held Arthur Treacher's and Mrs. Paul's in contempt. We have concluded that the district court was not clearly erroneous in its findings that Arthur Treacher's and Mrs. Paul's had violated Judge Sand's order. We have also concluded that the remedy imposed by Judge Hannum was not only related to the violation, but well within his remedial powers to decree.[16]

We will affirm the district court's order of July 21, 1981.[17]

---

16. In a footnote to its brief, Arthur Treacher's also complains of the $1,000 counsel fee awarded to Magnesco's counsel by the July 21, 1981 order, citing *Lichtenstein v. Lichtenstein,* 425 F.2d 1111, 1114 (3d Cir. 1970). *Lichtenstein* holds that "it is an abuse of discretion to award [attorney's fees, expenses and costs] unless there is some indication of record as to the reasonableness." We have reviewed the entire record on this appeal, including the July 15th and 16th hearings which took two full days. We are satisfied that the record supports the modest award of $1,000 made by Judge Hannum for reasonable attorney's fees, costs and

expenses, and that there was no abuse of discretion.

17. Magnesco, in its brief, (p. 8) claims that Worcester has never been reinstated as an approved distributor, and Arthur Treacher's and Mrs. Paul's have not paid any monies to Magnesco as required by the lower court's order, although no stay of the Order has been granted.

We express no opinion with respect to these representations, as the issue of compliance by Arthur Treacher's with the July 21st order, is not presented on this record.